1

2

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

3

4  GEORGE BELCH, an individual,                    )

5                    Plaintiff,                    )

                     vs.                           )        Case No.: 2:10-CV-00201-GMN-VCF

6                                                  )

7  LAS VEGAS METROPOLITAN POLICE                   )                **ORDER**
   DEPARTMENT, et al.,                             )

8                    Defendants.                   )

9  _____)

10         Before the Court is the Motion for Summary Judgment (MSJ, ECF No. 42) filed by

11  Defendants Las Vegas Metropolitan Police Department, and Officers J. Melton, M. Thiele, J.

12  Zinger, K. Geiger, and S. Keith (collectively, "Defendants").  Plaintiff George Belch filed a

13  Response (ECF No. 59) after a substitution of counsel (ECF Nos. 53-55), and Defendants filed

14  a Reply (ECF No. 62).

15  **I.      BACKGROUND**

16         Plaintiff sued Defendants in this Court on eight causes of action: (1) Violation of Civil

17  Rights to Life and Security of Person, 42 U.S.C. § 1983; (2) Violation of Plaintiff's Civil

18  Rights – Municipal Liability, 42 U.S.C. § 1983; (3) Negligence; (4) Negligent Training and

19  Supervision; (5) Battery; (6) False Imprisonment; (7) Intentional Infliction of Emotional

20  Distress; and (8) Negligent Infliction of Emotional Distress. (Compl., ECF No. 1.)  The Court

21  dismissed Plaintiff's claim of Negligent Training and Supervision (ECF No. 18), and all claims

22  against Officer Keith (ECF No. 40) [1], and denied Plaintiff's motion to add Officer Hopson as a

23  defendant. (Order, ECF No. 68.)

24  _____

25  [1] On September 15, 2011, Defendant stipulated to dismiss Defendant Officer S. Keith with prejudice, and the
   Court so ordered. (ECF Nos. 39, 40.)

Unless otherwise indicated, the following undisputed facts are taken from excerpts of the depositions of Plaintiff, his daughter Raenna Belch, Officer Thiele, Officer Zinger, Officer Geiger, and Officer Melton. (George Belch Dep. Vol. 1-2, Exs. A, N to MSJ; Raenna Belch Dep., Ex. B to MSJ; Thiele Dep., Ex. I to MSJ; Zinger Dep., Ex. J to MSJ; Geiger Dep., Ex. K to MSJ; Melton Dep., Ex. L to MSJ.)

On the night of March 10, 2008, Plaintiff's daughter, Raenna, called him at work and told him that her mother's boyfriend, Michael Petitta, had struck her in the eye at her mother's house and that she had a black eye. (George Belch Dep., Vol. 1, 140:8-11, 145:9-10.)  Raenna's mother, Angelina Belch, was still married to Plaintiff but they were separated at the time and not living together. (*Id*. at 116-117.)  Annie Belch made payments on the house but it was still listed in Plaintiff's name. (*Id*.)  Raenna did not live at the house and did not have a key, but was dating Richard Dorsey, who rented a room from Angelina. (Raenna Belch Dep., 39-40.)

According to Raenna, earlier in the night she had been verbally fighting with her boyfriend in his room, when Angelina came in to interrupt. (*Id*. at 43-44.)  Then, Raenna and Angelina began fighting and when it escalated to physical fighting, Petitta physically joined the fight as well, grabbing both Raenna and Angelina in headlocks. (*Id*. at 44.)  At that time, Raenna alleges that Petitta hit her in the eye, and then held her while Angelina hit her in the face. (*Id*. at 44, 47-49.)  Dorsey then held a pocket knife to his own neck to stop the fighting, and Petitta wrestled him to the floor. (*Id*. at 44, 49.)  Raenna and Dorsey then left the house after Angelina threatened to call the police. (*Id*. at 44, 51.)

Raenna called Plaintiff from a park near the house, where she waited with Dorsey. (*Id*. at 52-53.)  Plaintiff told Raenna to stay at the park until he finished work and could come get her. (George Belch Dep., Vol. 1, 140:12-17.)  Plaintiff did not call the police at that point, and did not tell Raenna to call the police. (*Id*. at 140-141.)

Plaintiff left work around 12:30 a.m. and decided to go to the house before calling

Raenna or anyone else. (*Id*. at 148.)  Raenna and Dorsey walked back to the house a few minutes before Plaintiff arrived and were waiting nearby on the side of the house. (Raenna Belch Dep., 58.)  When Plaintiff arrived, he parked across the street from the house and knocked on the front door. (*Id*. at 72; George Belch Dep., Vol. 1, 149.)  Angelina opened the door and Plaintiff told her that Petitta had to leave the house. (*Id*.)  After disputing Raenna's version of the night's events, Angelina then locked and closed the door and went back in the house, still talking to Plaintiff through the window. (*Id*.)  Plaintiff stated that he told Angelina that "this is the second time Mike [Petitta] has his hands on my daughter. I need him to go ahead and get his stuff and leave the premises." (George Belch Dep., Vol. 1, 152:7-8.)

At that point, Raenna came out from the side of the house and offered to use Dorsey's key to get into the house, and Raenna eventually broke open the door to get in. (George Belch Dep., Vol. 1, 161; Raenna Belch Dep., 72-74.)  Raenna, Dorsey, and Plaintiff then entered the house to confront Petitta and Angelina. (Raenna Belch Dep., 74; George Belch Dep., Vol. 1, 161.)  When they entered, Petitta was holding up a cell phone and indicated that he was calling the police. (*Id*.)

Officer Melton explained in his deposition that when he received the police dispatcher's radio broadcast the computer terminal inside the police car also provided continuous live updates. (Melton Dep., 35:16-24.)  According to the Incident Recall for the event, at approximately 1:42 a.m., the 911 call was initiated indicating that the ex-husband of the caller's fiancé was trying to break into the house. (Ex. CC to Reply, ECF No. 62-1).  The incident was originally given Priority One status, but was changed to Priority Zero status when the operator heard a female yelling and the caller indicated that the ex-husband had just broken into the residence. (*Id*.)  The officers were informed that a man fitting the description of Belch was breaking into the home and that there was lots of yelling and arguing. (*Id*.)  The caller (Pettita) identified the Plaintiff as the intruder and identified him by name as George Belch. (*Id*.)  The

caller reported that there were weapons in the house and that he was uncertain as to whether Belch was armed. (*Id.*)  Also, the caller reported that at least one person was potentially under the influence of drugs and that there had been a previous incident at the house. (*Id.*)  The caller also indicated that he was a retired Officer from Pennsylvania. (*Id.*)

Plaintiff stated that he exited the house expecting that the police would come, and stood on the sidewalk in front of the house. (George Belch Dep., Vol. 1, 193:14-17, 199:14-17.) Around the time he noticed police at the end of the street, Raenna exited the house and handed him her backpack. (*Id.* at 200:3-19.)  She said that she was going to leave and asked Plaintiff to put the backpack in his car. (*Id.* at 217:19-23; Raenna Belch Dep., 76:11-20.)  Plaintiff stated that he told her "No, you're not. You're going to stay here.  You're going to trust the police, trust that they're going to do the right thing." (George Belch Dep., Vol. 1, 217:19-23.)  Raenna stated that he told her, "No, just wait here, and trust and believe that the police are here to serve and protect you, they'll do what's right." (Raenna Belch Dep., 76:17-19.)  At that point, Plaintiff and Raenna noticed Officer Geiger's car approaching. (*Id.* at 76:20-22; George Belch Dep., Vol. 1, 218:4-11.)

The remainder of the events that night are in dispute.  Officer Melton stated that he was among the first three to arrive on the scene, followed by Officer Beaumont Hopson who parked behind him. (Melton Dep., 38:14-25, 44:21-22.)  He stated that when he first arrived on the scene, Officer Geiger, a female officer, was already present and standing in the middle of the street. (*Id.* at 42, 15-18.)  In a notarized affidavit submitted to the Court, Officer Hopson stated that he believed Officer Melton was directly behind him as he approached the house, and that they stopped approximately eight houses away. (Hopson Aff., Ex. BB to MSJ.)  Officer Hopson stated that Officer Geiger arrived around the time that he and Officer Melton exited their vehicles. (*Id.*)  Officer Geiger stated that she responded to the call that came over the radio in her patrol car and when she arrived, she saw two other police cars but no other Officers. (Geiger Dep., 18-19.)

As Officer Geiger was slowly driving up to the scene, she heard Plaintiff call to her through her open window and then she parked the patrol car, got out and approached Plaintiff. (Geiger Dep., 24, 26.)  She believed Plaintiff said "[s]omething about he needed us over there," and that she then asked him to come over to her. (*Id.* at 26:19-23, 27:3.)  Plaintiff stated that at first he saw Officer Geiger drive past the house, park and then step out of the car, but that she got back in the car and did two U-turns to get back to him after he said "hey" and waved her back, saying "Hey, it's back here.  Come on back.  You're at the wrong place.  Everything's okay." (George Belch Dep., Vol. 1, 218:14-22.)

Officer Geiger stated that she and Plaintiff "had the street between us" at the time, and that she was stationary. (Geiger Dep., 27:6, 8, 23.)  She stated that Plaintiff responded, but that she didn't remember Plaintiff's exact response, and that he didn't listen to her and walked towards his car. (*Id.* at 30:8-11.)  Plaintiff stated that he was walking to his car already by the time Officer Geiger got out of her car the second time, and that he had already passed her and was opening his car door when she said "Sir, what's in your hand?" (George Belch Dep., Vol. 1, 223:15-20.)  Plaintiff stated that he placed the backpack in the car and showed her his hands as he told her, "It's my daughter's backpack.  I'm placing it in my car." (*Id.* at 223:21-23, 225:18-23.)

Raenna stated that she heard Officer Geiger ask Plaintiff, "Sir, what do you have in your hand?" and that Plaintiff responded, "I just have my daughter's backpack.  I'm just going to put it in the car." (Raenna Belch Dep., 80:8-11.)  Raenna stated that at this time Officer Geiger began to act "weird" and "strange" as demonstrated by her physical demeanor but did not communicate anything else, and that Plaintiff stated, "There's nothing to worry about, I'm just putting my daughter's backpack in the car. You have nothing to be scared of.  There's nothing to worry about." (Raenna Belch Dep., 79:6-17.)

Officer Geiger stated that she asked Plaintiff to show her his hands, and that he didn't

comply, saying instead, "Give me a second, give me a second." (Geiger Dep., 31:9-18.)
Officer Geiger stated that Plaintiff's answer was "fairly angry" and that as he said it he was
walking towards his car carrying a backpack. (*Id.* at 18-25.)  She said that Plaintiff opened the
door to his car, put the backpack in and then turned around towards her. (*Id.* at 32:7-10.)  At
this point, Officer Geiger stated that she could not see Plaintiff's hands and that the lighting
was dim. (*Id.* at 32:16-24.)  Finally, after she "raised [her] voice enough to where [she] wanted
to see his hands to make sure he didn't have weapons," Officers Hopson and Melton "came up
from [her] left and took [Plaintiff] into custody." (*Id.* at 35:1-5, 8, 18.)

        According to Officer Melton and Officer Hopson, they came upon the scene and saw
this exchange but could not hear the conversation. (Melton Dep., 46:11-18; Hopson Aff., 2:¶¶6-
7.)  Officer Melton stated that he saw Officer Geiger pointing at Plaintiff and shouting. (Melton
Dep., 48:6-7, 24.)  Officer Melton stated that he did not see Plaintiff with any weapon and he
was not in any kind of aggressive posture. (*Id.* at 49:8-13.)  Officer Hopson recalls hearing
Plaintiff state, "Don't be afraid, I am not going to hurt you" as Plaintiff turned away from his
car toward Officer Geiger. (Hopson Aff., 2:¶7.)  He recalls that Officer Melton began to issue
verbal commands to Plaintiff as they neared twenty-five feet from Plaintiff, including a
command to get on the ground, which was repeated at least three times in a loud command
voice. (*Id.* at 8.)  Officer Melton stated that he started issuing commands around twenty feet
from Plaintiff, telling him to get on the ground very loudly. (Melton Dep., 50:24-25–51:1,
52:11-21.)  Officer Melton stated that he repeated the command to get on the ground "more
than ten, probably less than 25" times. (*Id.* at 53:1-14.)

        Raenna stated that she witnessed Plaintiff trying to talk to the Officers, saying "This is
my house" and "My daughter got hit in the eye." (Raenna Belch Dep., 84:15-20.)  She stated
that she heard Officer Melton yelling at Plaintiff to get on the ground about three times, and
Plaintiff replying "Why?" (*Id.* at 85:1-5, 90:9-13.)  Officer Melton stated that while he was

commanding Plaintiff to get on the ground, Plaintiff "kept having his hands up over his shoulder like, What, what, what, what? I'm not doing anything, what? Waving his hands around" with his palms facing Officer Melton above his shoulders. (Melton Dep., 54:13-23.)

Raenna stated that she then saw Plaintiff "going to get on the ground" and "Officer Melton like lunged at him, like he went to go lunge over his head to like slam his head down, is what it looked like he was going to do." (Raenna Belch Dep., 85:6-10.) She also explained that as a result, Plaintiff made a motion and then two other Officers came up, grabbed Plaintiff's legs and "tried to like throw him down, or something, tried to like tackle him. And [Plaintiff] walked over to the – over to a driveway so that he could lay down and not ruin his nice dress pants." (*Id*. at 85:10-18.) She stated that after Plaintiff "had laid down, Officer Melton ran over there and there was two or three officers on [Plaintiff]. And as he was laying down calmly, they were all being crazy. And he had one cuff [] in a handcuff, and Officer Melton was by his head..." (*Id*. at 85:20-24.) This deposition excerpt ends before Raenna's statement concludes, however in another excerpt provided to the court, she stated, "And Officer Melton had struck [Plaintiff] in the back of the… [end of deposition excerpt]." (*Id*. at 85:24-25.) Raenna stated that she saw Plaintiff with his hands up, palms showing, and his body low to the ground because he was going to get down. (*Id*. at 89:13-22–90:1-5.) She stated that Plaintiff got on the ground voluntarily as Officer Melton approached him. (*Id*. at 90:14-25.)

In Plaintiff's own deposition, he stated that at this point he looked to the ground, bent at his waist, and then looked back up at Officer Melton. (George Belch Dep., Vol. 2, 9-18.) When Plaintiff "looked back down to exactly see what spot [he was] getting down on," Plaintiff stated that Officer Melton "lunges forward with his hands and snaps me – my neck from the back of my head, tries snapping me down to the ground face first." (*Id*. at 267:9-13.)

Officer Melton stated that because Plaintiff kept "flailing his arms around," he "went to grab one of [Plaintiff's] arms and his shoulder to pull him to the ground" and that Plaintiff

"broke loose." (Melton Dep., 55:4-7.)  Officer Melton stated that he "continued to reengage [Plaintiff] by trying to grab his arm or his shoulder area and push him onto the ground, and he kept fighting me with that, and I kept asking him to stop and stop resisting and get onto the ground." (*Id*. at 55:7-11.)  Officer Melton recalled that Plaintiff "kept yelling, Why, why, why? I didn't do anything." (*Id*. at 55:11-12.)  Officer Melton stated that it "went on for several minutes" and that Plaintiff "was not violent toward [him]" and "not showing any behavior that showed me that he wanted to hurt me.  No punches, kicks, no bites, no spitting, just a lot of verbal disagreement of why am I here to tell him to get onto the ground type of thing." (*Id*. at 55:13-18.)  Officer Melton stated that Plaintiff was a "big guy" and "kept breaking away from me." (*Id*. at 55:19-20.)

At one point, Officer Melton stated that Officer Hopson "started to back off" and said, "I'll tase him," but that he "called that off" saying "No, not necessary.  Just help me push him down on the ground." (*Id*. at 56:11-15.)  Officer Melton stated:

> And to me, the Taser would have been an appropriate use of force at that point, the pepper spray would have been.  The baton would have been.  I felt like I did not need those options.  I've seen this before.  I didn't feel threatened.

(*Id*. at 56:18-22.)  Raenna Belch and Officer Geiger, stated that they saw a red laser or Taser pointed at Plaintiff during the struggle, and Officer Hopson stated that he pulled his Taser as well as another officer in the area. (Raenna Belch Dep., 97:13-15; Geiger Dep., 44:15-25–45:1-19; Hopson Aff., 3:¶12.)

The entire deposition of Plaintiff is not included in the evidence submitted to the Court by Defendants, and Plaintiff did not submit any portions of his deposition to support his Response.  However, Defendants did submit a "Statement of George Belch Regarding Events on 3/10/2008" along with their motion, described as "Original of Statement Given Internal Investigations" in handwriting at the top. (Ex. M to MSJ.)  In that statement, Plaintiff adds

numerous details to the deposition excerpts supplied by Defendants, including this version of the events:

> While standing on the crown of the middle of the street when Officer Melton came into clear view at 40 feet, Officer Melton moved to the middle of the street and began his march toward me showing anger, aggression and hostility. I did not move in any way standing still and holding my hands in clear sight with my palms to the sky. At 10 feet Officer Melton stated for me to get to the ground. I asked why while keeping my palms to the sky. He did not slow in his march and at 5 feet he again stated get to the ground. I asked why again and was clearly giving him my hands in surrender with my palms still to the sky. At this point he was standing an arms length away and demanded me to get down to the ground now! With all the ingredients that I earlier stated he was showing and I would to add his closed mindedness and disrespect. I looked to the ground and looked back up at him and he jumped toward at me, grabbing me behind my head in an attempt to snap me down toward the ground. In self-defense I pushed him off of me. Two other officers attempted to tackle me to the ground creating a momentum to the left (south) of where I was originally standing. I felt one officer slide all the way off of my body and knew at this point I must stop their momentum in which we traveled 6 or 7 steps, keeping the officer connect to me, at this point he was down around my knees. I let myself down to the ground and was careful to not harm or kick the connected officer in any way. While down on the ground in a complete submission position with my left hand behind my back awaiting to begin the hand cuff process, the officer that was the last to be connected began to hand cuff my left wrist and failed his first attempt pinching my skin. He then repositioned his handcuffs and was successful in securing my left wrist. In a split second after this I felt a very violent impact to the back of my neck from a hard blunt object that was followed by him placing his forearm on the back of my head in an attempt to humiliate me by pushing my face into the concrete. I responded by not allowing my face to hit the concrete and that it was uncalled for and turned to my right to find a red laser roaming my mid section area (stomach). I turned to the ground immediately. An officer stated quit resisting and I asked how in the f… am I resisting when I gave you my hand to cuff. At this point I gave my right hand and it was cuffed. I was rolled over and helped to my feet.

(Ex. M to MSJ.)

Officer Zinger stated that he arrived while Plaintiff was face down on the ground and being handcuffed. (Zinger Dep., 20:5-6.) Eventually, Officer Melton and another officer

helped Plaintiff to his feet after he was handcuffed. (Melton Dep., 76:18-21.)  Officer Thiele

arrived after Plaintiff was handcuffed and sitting on the curbside. (Thiele Dep., 24:17-19, 25:1-

3.)  Officer Thiele also stated that he believed he was "the second one to arrive" and that

Officer "Hobson" arrived after him. (*Id*. at 25:17-25–26:1.)

Plaintiff indicated in his September 8, 2011, deposition that no one ever used a "Taser"

on him. (George Belch Dep., Vol. 2, 336:14-16.)  Raenna Belch stated the same. (Raenna Belch

Dep., 97:19-21.)  Plaintiff stated that he noticed contusions on the back of his neck the

following day. (George Belch Dep., Vol. 2, 336:17-19.)  Photos taken of Plaintiff do not reveal

obvious injuries. (*See* Photographs, Ex. O to MSJ.)  Plaintiff was never arrested or charged and

alleges that Defendants improperly took the word of Petitta without first investigating the

incident and used excessive force in restraining Plaintiff. (Compl. at ¶¶ 46–47; Melton Dep.,

89:12-16.)

## II.   **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that

may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Factual disputes whose resolution would not affect the outcome of the suit are

irrelevant to the consideration of a motion for summary judgment. *Id.* A dispute as to a material

fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all

inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's

favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United

States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary

judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

### III.   **DISCUSSION**

Here, in order to meet their burden, Defendants must either present evidence to negate an essential element of Plaintiff's case, or demonstrate that Plaintiff's showing was insufficient to establish an essential element of his case.

Plaintiff's first two claims arise under 42 U.S.C. § 1983: (1) Violation of Civil Rights to Life and Security of Person; and (2) Violation of Plaintiff's Civil Rights – Municipal Liability. Under the first claim, Plaintiff alleges four constitutional violations that have not been

/ / /

/ / /

dismissed by the Court[2]:

    a. Deprivation of liberty without due process of law – Fourteenth Amendment;
    b. Denial of equal protection of the laws – Fourteenth Amendment;
    c. Use of excessive force by law enforcement officers – Fourth Amendment; and
    d. Freedom from pre-conviction punishment – Fourteenth Amendment.

(*See* Compl., 8-9:¶52, ECF No. 1; Order, March 21, 2011, ECF No. 18.)

       Plaintiff's remaining five claims arise under state law: (1) Negligence; (2) Battery; (3) False Imprisonment; (4) Intentional Infliction of Emotional Distress ("IIED"); and (5) Negligent Infliction of Emotional Distress ("NIED").

    **A.    <u>Section 1983 Claims</u>**

        **1.    Constitutional Violations**

           ***a.    Fourth Amendment - Excessive Force***

       "In evaluating a Fourth Amendment claim of excessive force, courts ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "[W]e must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 at 396-97).

---

[2] In the Court's March 21, 2011, Order, the Court held that "Plaintiff's allegation of excessive force will be analyzed under the lens of the Fourth Amendment, rather than substantive due process, but his remaining Constitutional claims will be analyzed under the applicable provisions of the Fourteenth Amendment." (Order, 9:16-19, ECF No. 18.)

This analysis involves three steps.  "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (quotation marks omitted).  "Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Id.*  "Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (quotation marks omitted).  "[I]n police misconduct cases, summary judgment should only be granted sparingly because such cases often turn on credibility determinations by a jury." *Id.*

### (1) Type and amount of force inflicted

Viewing the facts in the light most favorable to Plaintiff, up to three officers "tackled" Plaintiff to the ground without provocation from him, and after he had indicated compliance with the officers' commands.  Raenna stated that she saw Plaintiff lowering himself to the ground voluntarily before Officer Melton lunged at him and two other officers tried to tackle him.  At some point there were multiple blows to his neck and shoulders, as well as use of force by more than one officer to wrestle and push Plaintiff's head and body to the ground and to grab his arms in position for handcuffing.  Plaintiff stated that he noticed contusions on the back of his neck the following day.  Although Plaintiff does not maintain that a Taser was used on him, all parties appear to agree that a Taser was drawn and pointed; its use was contemplated.

Plaintiff submitted medical records to show the extent of the harm caused by the incident, including a February 2010 Psychiatric Evaluation in which he presented with anxiety symptoms in response to paranoid thoughts and was diagnosed with a psychotic disorder, alcohol abuse, hypertension and other chronic pain (Ex. 2 to Reply, ECF No. 59).  Plaintiff also submitted a Radiology Report (Ex. 3 to Reply, ECF No. 59) from November 2008, in which he

presented with right shoulder pain.  Plaintiff also submitted employment termination records to show hardship as a result of the incident. (*See* Ex. 4 to Reply, ECF No. 59.)  Defendants submitted medical records of Plaintiff in which evaluating physicians discussed Plaintiff's symptoms and diagnoses, including cervical strain and possibly shoulder soft tissue strain. (*See* Exs. U, V to MSJ.)  Defendants also submitted color photographs of Plaintiff and his wrists, taken sometime after handcuffs were removed. (Ex. O to MSJ; Notice of Manual Filing, Ex. O, ECF No. 43.)

Accordingly, the Court finds that a reasonable jury could conclude that the type and amount of force inflicted was substantial.

### *(2) Governmental Interest*

To evaluate the governmental interest, the Court assesses, from the Officers' perspective, the severity of Plaintiff's crime, whether Plaintiff posed an immediate threat to the officers' or public's safety, and whether Plaintiff was resisting or attempting to escape.

Here, the officers initially had at least some interest in detaining Plaintiff based on the facts provided to them from the police radio dispatcher as to the severity of the crime: home intrusion.  First, the officers were responding to a Priority Zero reported forced entry of a residence and domestic violence call.  The 911 caller reported that at least one person was under the influence of drugs and it was unclear as to whether Plaintiff was armed.  The Officers had an interest in controlling the potentially violent situation.

However, upon arrival and interaction with Plaintiff, and drawing all inferences in favor of Plaintiff, the Officers later had little reason to believe that Plaintiff had any weapons.  Officer Melton stated that Plaintiff was not in any kind of aggressive posture, that Plaintiff was not violent and did not show any behavior indicating that he wanted to hurt him.  Officer Melton also specified that there were no punches, kicks, bites, or spitting on the part of Plaintiff, just verbal disagreement.

As to the second assessment of immediacy of threat, this factor is neutral at best. Although Plaintiff was identified as a potentially dangerous suspect and he did not immediately obey Officer Melton's initial command to get down on the ground, Plaintiff's hands were turned toward the sky indicating that he had no weapon in his hand.  Therefore, objectively, officers could disagree as to whether Plaintiff was an immediate threat to officer or public safety.

Last, regarding Plaintiff's resistance, viewing the facts in the light most favorable to Plaintiff, Plaintiff was not actively resistant.  Plaintiff's own statements confirm that he was at least initially non-compliant because he did not begin to get to the ground the first two times Officer Melton instructed him to do so.  However, the Court finds that a reasonable juror could conclude that when Plaintiff "looked to the ground and looked back up" and began bending at the waist, despite only doing so after being instructed three times to "get to the ground," he was complying or beginning to comply with officer directions.  A reasonable juror could also find that offering his left hand to be cuffed was not active resistance even if he kept his right hand by his face.  Accordingly, the Court finds that a reasonable jury could conclude that the government had some interest in using force to subdue Plaintiff, but not a strong interest.

### (3) Balancing the gravity of the intrusion against the government's interest

On balance, there is a genuine issue of material fact as to whether the gravity of the Officers' actions was reasonable if Plaintiff was cooperating.  A determination of the level of Plaintiff's cooperation would affect the outcome of the suit and is relevant to the consideration of a motion for summary judgment.  For example, if a jury were to conclude that Plaintiff was fully cooperating at the time of the incident, any use of force could be unreasonable. Conversely, if a fact-finder were to determine that Plaintiff appeared to be resisting, then the amount of force used could be considered reasonable.

Reviewing the evidence, the Court concludes that a jury, drawing all factual inferences in favor of Plaintiff, could reasonably choose to believe Plaintiff's testimony and evidence and to disbelieve Defendants' testimony and evidence.  Because the Court finds that a reasonable jury could conclude that the type and amount of force inflicted was excessive when balanced against the government's interest, and that therefore Defendants' use of force was not objectively reasonable, summary judgment must be denied as to this claim.

### b.    Fourteenth Amendment Rights

In its prior Order, this Court had specifically held that Plaintiff's "claim for substantive due process violations arising under the Fourteenth Amendment would be inappropriate where the Fourth Amendment is applicable," and that "Plaintiff's allegation of pre-conviction punishment may be analyzed under the substantive due process standard." (Order, 5:19-20, 6:13-14, ECF No. 18.)  However, the Court allowed Plaintiff's "claims arising under the Fourteenth Amendment for violations of procedural due process and equal protection" to the extent that he might produce evidence supporting the claims. (*Id.* at 5:20-22.)  Here, the Court concludes that Plaintiff's evidence cannot support his due process or equal protection claims.

When there is necessity for quick action or it is impractical to provide pre-deprivation process, then a post-deprivation state tort remedy for erroneous deprivation may satisfy procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 128 (1990) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)).  Here, Plaintiff's procedural due process claims are adequately remedied by the availability of state tort law causes of action.

In response to Defendants' state tort remedy argument, Plaintiff recharacterizes the Fourteenth Amendment right as substantive, rather than procedural.  It is true that the Ninth Circuit has held that where a plaintiff can make a valid a Fourteenth Amendment substantive due process claim, the availability of state remedies is not a bar. *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).  However, Plaintiff's reliance on *Wood* is misplaced.  The

overwhelming weight of authority establishes that where a plaintiff bases a Fourteenth Amendment substantive due process claim on excessive force facts, the proper remedy is provided by the Fourth Amendment. *See id.*; *Graham*, 490 U.S. at 393.

Here, to support his allegation of a Fourteenth Amendment due process violation premised on the officers' reckless or negligent disregard for his safety, Plaintiff repackages the same excessive force facts argued in the Fourth Amendment excessive force section.  Namely, Plaintiff argues that he was recklessly or negligently struck in the back of his neck by the officers.  These acts, if true, would constitute a substantive due process claim, not a procedural due process claim, and do not support a claim of violation of equal protection.  Under *Graham*, Plaintiff's reframing of the issues as a substantive due process claim based on excessive force facts makes the Fourteenth Amendment claims fail as a matter of law.  Accordingly, the Court will grant summary judgment in Defendants' favor as to Plaintiff's claims for deprivation of liberty without due process of law, equal protection of the laws, and the right to be free from pre-conviction punishment.

## 2.    Municipality Liability

Plaintiff argues that there is Municipal Liability because the "policy and customs" taught in the police academy were the cause of the alleged excessive force constitutional violation.  A plaintiff may establish § 1983 municipal liability in one of three ways. *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  First, the plaintiff may prove that a "city employee committed the alleged constitutional violation pursuant to a formal governmental policy." *Id.* Second, the plaintiff may establish that "the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy." *Id.*  Third, the plaintiff may prove that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.*  Municipal liability is not contingent on the liability of

individual officers, but it is contingent on a violation of constitutional rights. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

Plaintiff relies on Officer Melton's deposition testimony to support his claim that the officers subdued him pursuant to policy and customs taught in the police academy.  Here, the Court finds that a reasonable jury, taking all inferences in favor of Plaintiff, could find that the officers' techniques and actions were carried out pursuant to the training they received from the LVMPD.  Accordingly, the Court will deny summary judgment as to this claim.

### B.   State Law Claims

#### 1.   Negligence

In a negligence action, the plaintiff must demonstrate: "(1) that the defendant had a duty to exercise due care with respect to the plaintiff; (2) that the defendant breached this duty; (3) that the breach was both the actual and proximate cause of the plaintiff's injury; and (4) that the plaintiff was damaged." *Joynt v. Cal. Hotel & Casino*, 835 P.2d 799, 801 (Nev. 1992).  An officer's breach of duty in a negligence claim is "analyzed under the reasonableness standard of the Fourth Amendment." *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1164 (N.D. Cal. 2009); *see also Luchtel v. Hagemann*, 623 F.3d 975, 984 (9th Cir. 2010).  Thus, if an officer acted reasonably, there was no breach of duty. *Knapps*, 647 F.Supp.2d at 1164.

As discussed above, taking the facts in the light most favorable to the Plaintiff, there remain genuine issues of material fact as to the reasonableness of the officers' actions and Plaintiff's damages.  A finding of reasonableness of the officers' actions negates breach of duty and necessarily changes the outcome.  Thus, the Court finds that summary judgment is improper as to this claim.

#### 2.   Battery

Battery is the "intentional offensive or harmful contact with another person without legal justification." Restatement 2d § 18, 21 (1965).  The standard for common-law battery by a

police officer mirrors the federal civil rights law standard: "Liability attaches at the point at which the level of force used by a peace officer exceeds that which is objectively reasonable under the circumstances." *Ramirez v. City of Reno*, 925 F.Supp. 681, 691 (9th Cir. 1996). "Police officers are privileged to use that amount of force which reasonably appears necessary, and are liable for battery to the extent they use more force than is reasonably necessary." *Id.*

As discussed above, the Court finds that, taking the facts in the light most favorable to the Plaintiff, there remain genuine issues of material fact as to the reasonableness of the officers' actions. A finding of reasonableness of the officers' actions makes the action lawful and necessarily changes the outcome. Thus, the Court finds summary judgment is improper as to this claim.

### 3.    False Imprisonment

To establish false imprisonment, Plaintiff must show he was "restrained of his liberty under the probable imminence of force without any legal cause or justification." *Garton v. City of Reno*, 720 P.2d 1227, 1229 (Nev. 1986). The Court looks to whether objectively, the officers' had reasonable suspicion that the Plaintiff "ha[d], or [wa]s about to have, committed a crime." *U.S. v. Manzo-Jurado*, 457 F.3d 928, 934 (9th Cir. 2006). In such a case, reasonable suspicion constitutes legal justification for the restraint. *Id.*

Here, Plaintiff does not claim that the officers kept him restrained any longer than necessary to obtain information to conduct their investigation. Therefore, for the purposes of this analysis, the Court only looks to the officers' actions before Plaintiff was in custody. Plaintiff argues that the officers did not have legal justification because any suspicion was based on Officer Geiger's failure to communicate causing the officers to misinterpret the situation. The Court disagrees. Viewing the facts in the light most favorable to Plaintiff, and assuming that where the parties disagree as to the facts, Plaintiff's version of events is true, there is no evidence that would permit a fact-finder to conclude that the officers acted

unreasonably pre-detention under the circumstances relayed to them by the police dispatcher according to the information provided by the caller.

As stated above, based on the information available to the officers at the time, Plaintiff was the identified suspect in a volatile domestic violence situation where drug use was alleged and the presence of weapons was suspected and could not be ruled out. According to Plaintiff's own statement, he never told the officers he was not involved in the altercation until after he was restrained. In fact, Plaintiff's statements of "everything is ok" and "don't be scared" to Officer Geiger did not communicate his lack of involvement in the conflict. The officers did not, and could not have, known that Plaintiff was innocent at the time he was restrained. An officer arriving on the scene could only know that Plaintiff was the suspect by the 911 caller. Clearly, Plaintiff heard Officer Melton's command when he responded "Why?" to the direction and Plaintiff did not immediately obey Officer Melton's command. Thus, even if Officer Geiger utterly failed in communicating with Plaintiff and there was an incorrect inference of Plaintiff's lack of cooperation, the officers still had reasonable suspicion based solely on the matching description of Plaintiff as the suspect in the 911 call.

The Court rejects Plaintiff's argument that the officers' subjective state of mind is relevant. In fact, the Court may only consider what an objectively reasonable officer would consider to be reasonable suspicion. Therefore, Plaintiff fails to show there is a genuine issue of material fact precluding summary judgment. Accordingly, the Court will grant summary judgment in favor of Defendants as to this claim.

### 4. Intentional Infliction of Emotional Distress

Intentional Infliction of Emotion Distress requires an adequate showing of: (1) intentional or reckless extreme and outrageous conduct, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation. *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981). The Court determines whether the defendant's conduct is

extreme and outrageous, but, "where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Norman v. Gen. Motors Corp.*, 628 F.Supp. 702, 704-05 (D. Nev. 1986) (considering "totality of the circumstances" in determining whether conduct is extreme and outrageous); Restatement (Second) of Torts § 46 cmt. h.

"[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 953 P.2d 24, 26 (Nev. 1998).  Thus, by definition, reasonable behavior cannot be extreme or outrageous. *Id.*

Here, even drawing all inferences in favor of Plaintiff, the Court cannot find that a reasonable jury might conclude that the Officers' actions constituted intentional or reckless extreme and outrageous conduct, outside all possible bounds of decency and regarded as utterly intolerable in a civilized community.  Accordingly, the Court will grant summary judgment in favor of Defendants as to this claim.

### 5.   Negligent Infliction of Emotional Distress

In Nevada, to prevail on a Negligent Infliction of Emotional Distress claim, the Plaintiff must prove: (1) Defendant owed a duty of care to the Plaintiff; (2) Defendant breached that duty; (3) The breach was the proximate cause of Plaintiff's injuries; and (4) Plaintiff suffered serious emotional distress. *Olivero v. Lowe*, 995 P.2d 1023, 1026 (Nev. 2000).  Nevada recognizes both bystander and direct theories of a negligent infliction of emotional distress claim. *Shoen v. Amerco, Inc.*, 896 P.2d 469, 477 (Nev. 1995).

As discussed above, and taking the facts in the light most favorable to the Plaintiff, there remain genuine issues of material fact as to the reasonableness of the officers' actions.  The Court also finds that a reasonable jury could conclude that Plaintiff suffered serious emotional distress proximately caused by a breach of Defendants' duty of care.  Accordingly, the Court

finds summary judgment is not proper as to this claim.

**IV.   CONCLUSION**

   **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 42) is **GRANTED in part**, and **DENIED in part**, as follows:

   Defendants' motion is **GRANTED** as to Plaintiff's Constitutional claims for violations of due process, equal protection and freedom from pre-conviction punishment, as well as to Plaintiff's claims for false imprisonment, and intentional infliction of emotional distress; and is **DENIED** as to Plaintiff's Constitutional claim under 42 U.S.C. § 1983 for excessive use of force as guaranteed by the Fourth Amendment, as well as to Plaintiff's claims for municipality liability, negligence, negligent infliction of emotional distress, and battery.

   **DATED** this 30th day of September, 2012.

_____
Gloria M. Navarro
United States District Judge